UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

JATOON MOSS,

    Plaintiff,

v.

RICKY DIXON, et al.,

    Defendants.

Case No. 3:21-cv-1026-MMH-MCR

**PLAINTIFFS' RESPONSE TO MOTION TO DISMISS
BY DEFENDANTS DURE AND COREY (ECF 33)**

Plaintiff JATOON MOSS, through counsel, responds to the Motion to Dismiss (ECF 33) by Defendants DURE and COREY, and would show:

1. Defendants Jean Dure and Amanda Corey contend that all Plaintiff's claims accrued no later than September 13, 2017, and are therefore barred by Florida's four-year statute of limitations.

2. Defendants argue, without much evidentiary basis, that Mr. Ridley "was immediately aware of the severity of his injuries." (ECF 33 at 2).[1]

3. Defendants also argue that "Ridley was not only aware of his injuries and the persons who inflicted them, he was beyond the reach of the Medical Defendants so they could not have harmed him any further." (Id.). This

---

[1] This, Defendants assert while claiming that the trained medical staff were *not* aware of the severity of his injuries even after Mr. Ridley described them. Apparently, the basis of this assertion was that Mr. Ridley told medical staff he was unable to move his legs or arms and that he had pain in his shoulder and abdomen. (Exh. 1, RMC Emergency Room Record at 1).

1

statement is even more generous to the Defendants than the first. Mr. Ridley was the patient of Dr. Dure and Nurse Corey, of Centurion Health, his primary health care providers, even when he was being seen by consultant Dr. Hernan Chang at Memorial Hospital in Jacksonville.

4. Mr. Ridley was quadriplegic but nevertheless manacled to his hospital bed and RMC guards were posted to his hospital room. (Exh. 2, Gatewood Affidavit at ¶¶ 6-7). Diane Gatewood, Ridley's sister, said that in addition to being intubated, he did not appear lucid and she did not know if he realized she was in the room. (Id. at ¶ 7). He died two weeks after her last of several visits, after she had returned to Brooklyn, NY. (Id. at ¶ 5).

5. Plaintiff responds that the issue of accrual is governed by the point at which a Plaintiff becomes aware of the cause of action with reasonable diligence and has the capacity to assert it. Especially where Defendants participate in events that obscure the existence of a cause of action, there is no basis for dismissal at the pleading stage.

6. The Plaintiff has pled, and can further demonstrate, the later accrual or tolling of the causes of action but vitally needs discovery to demonstrate the means of delaying discovery of the cause of action in both medical and also corrections records that are already in the Defendants hands.

7. Decedent's emergency contact was his sister, Diane Ridley Gatewood, of

Brooklyn, New York. She was notified of the Decedent's hospitalization by a voice mail from Memorial Hospital social worker Glenda Webb on September 21, 2017, and was able to speak to Ms. Webb on September 22, 2017. She was on a plane to Florida the next day. (Exh. 1, ¶¶ 2-3).

8. Ms. Gatewood spoke to medical staff at the hospital who spoke only of a medical condition caused by a neck injury but was not told he had suffered physical violence. She was first able to visit him on September 27, 2017. She found him manacled to the bed, intubated, and unable to speak. Gatewood was not able to learn anything from him. Prison officials would not provide information about how he came to be injured. (Id., ¶¶ 4-9).

9. Ms. Gatewood first became aware of potential causes of action in this case through a Summary Report of a criminal investigation by the Florida Department of Law Enforcement (FDLE). The investigation concluded February 25, 2019. As an active criminal investigation, it was not disclosed to the public, including the Decedent's family before that time. (Id., ¶ 10).

10. Ms. Gatewood was able to get the Summary Report under Florida public records laws on November 20, 2020. She was first provided the full report, but without appendices, on February 21, 2021. (Id., ¶ 11).

11. It is not clear what Mr. Ridley was aware of during the brief time he was alive. Such words as he is alleged to have spoken are filtered through the

reports of the Defendants in this case. Shortly after he encountered Defendants Nettles and Jerrells, he suffered a paralyzing injury. That same day, he was left in a cell without a wheelchair and suffered a fall onto his face on the concrete floor of his cell. (Exh. 1 at 3; Exh. 4 at 12). It doesn't appear he spoke very much, even when he was left paralyzed on his bed unable to reach food or drink or use the toilet or receive medication. When his sister visited him in the hospital she thought he was brain dead. He didn't seem to know she was there though she spoke to him. (Exh. 2 at ¶ 7).

12. Defendants Dure and Corey also contend that Plaintiff's state law count for Outrageous Conduct is barred by the four-year statute of limitations. However while the use of force and failure to treat could be seen as having occupied a discrete time period prior to Plaintiff's death, the outrageous conduct continued until his death since the false information written into medical records and corrections reports was relied on in his hospital care.

## MEMORANDUM OF LAW

Plaintiff's operative complaint is not sufficiently detailed or nuanced to serve as a reliable basis to resolve questions relating to the statute of limitations. Those questions can only be resolved on a completed record. To the extent the operative complaint is insufficiently or inartfully pled, Plaintiffs will seek to further amend the complaint to overcome any such defects.

Under federal law, actions brought pursuant to § 1983 and the ADA accrue, or begin to run, "from the date the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights." *Ross v. Mickle*, 194 F. App'x 742, 744 (11th Cir. 2006). Here, the parties dispute the applicable law as well as the date on which the claims accrued. The parties should have an opportunity to fully develop the facts and brief the issue on summary judgment. *Ross*, 194 F. App'x at 744 (Plaintiff should show decedent was under a disability that prevented him from timely filing).

**A.** ***Walton for Est. of Smith v. Florida Department of Corrections***

The facts of this case present issues that are unusual but not unique. Defendants cite to the similar case of *Walton for Est. of Smith v. Fla. Dep't of Corr.*, No. 3:16-cv-1130-J-39JRK, 2018 WL 1393520, in which a Florida prisoner was alleged to have been fatally beaten by Florida corrections officers on July 3, 2012, and rendered quadriplegic on that date, but died two months later on September 4, 2012. Initially the district court found that the statute of limitations had passed but reversed its holding on reconsideration (ECF 61, Case 3:16-cv-1130-BJD-JRK (M.D. Fla. Feb. 6, 2019), attached as Exh. 3), finding that the date of accrual was a question for the jury since there were facts that made it unclear whether a cause of action was reasonably apparent, or decedent was under a disability that prevented him from asserting his rights. (Id. at 5-6, 7).

5

In *Walton*, as here, the decedent was rendered quadriplegic by his injuries and lingered in the prison wing of a hospital under guard. When family visited, he was intubated and unable to speak. It was not clear that he was lucid or fully aware of what had happened to him. The circumstances of his death were not made clear until a Florida Department of Law Enforcement (FDLE) investigation was made public. The Court chose to permit the parties the opportunity to fully develop the facts and brief the issue on summary judgment.[2]

Here, there are a number of factual details that suggest that a jury might not find that the facts which would support a cause of action were apparent or should be apparent to a person with a reasonably prudent regard for his rights. *See Ross v. Mickle*, 194 F.App'x 742, 744 (2006). After the severe injury suffered by Ridley in the use of force, he spoke very little and only described in simple terms how he felt. Even the words that he was alleged by Defendants to have spoken were filtered through persons who had reason to distort them. RN Amanda Corey was decidedly hostile to Ridley when his torso was being bent forward toward his legs and he said, "Put me back." Corey replied, "If you would have gotten up and

---

[2] Likewise, in *Amanda Cimillo v. Rollin Austin*, Case 4:16-cv-584-RH/CAS (N.D. Fla. Aug. 13, 2018), ECF 231, where a prisoner was gassed repeatedly, left in a contaminated cell, lingered for a few hours and was found dead in his cell on September 19, 2010. The lawsuit was filed more than two years after the expiration of the four-year statute of limitations. Plaintiffs argued, *inter alia*, that medical records provided were falsified and incomplete. The district court denied summary judgment on statute of limitations issues finding genuine factual issues that cannot be resolved on summary judgment.

got in that chair in there, this would not be happening." (Exh. 4, FDLE Summary at 6). RN Corey claimed she called Dr. Rodriguez to tell him she did not conduct any neurological tests on Ridley and that they should conduct those tests there. She said Dr. Rodriguez told her they had conducted the tests and at first he had some deficiencies but later got up and walked out of Urgent Care. (Id. at 7). Dr. Rodriguez maintained he never saw Ridley and never spoke to RN Corey about him but would have sent him straight to an acute care hospital. (Id.). Dr. Rodriguez also said there were forms missing from the file. (Id.).

After Mr. Ridley was first injured, the corrections staff moved him around in a wheelchair (Id. at 5), manhandling him into the chair to take him to medical and into a van to take him to the Main Unit Hospital. (Id. at 6). Medical staff ignored his quadriplegia in a way that was so contrived as to give rise to an inference that it was designed to hide the original wrongdoing of the corrections officers who first injured him. At one point it appeared Mr. Ridley's signature was forged. (Id. at 11). On one occasion a nurse, LPN Crissy Kirkland, documented that he had walked to the clinic. When questioned, she said an unknown security staff member told her that. (Id. 15 13). Later, Dr. Jean Dure also noted that Ridley was walking and Dure had seen him walk and his extremities tested normal. As he was questioned, Dr. Dure changed his statement and referred to the Kirkland note about walking. (Id. at 13-14).

When Ridley was cleared for confinement by Dr. Dure, rather than sent to an acute care hospital, he was propped up on a toilet and fell on his face when the officers left the cell. When he was placed back in the cell, he was arranged on the bed to make it look like he was sitting up, with his back against the wall and his feet on the floor. This is how he stayed for more than four days, (Id. at 14). During this time, Ridley was being served food and drink that he couldn't reach and that were taken away untouched. (Id. at 15, 16). Ridley had his prescribed medication checked off on the chart as if he had received it when a careful investigation showed it was never administered. LPN Stephanie Willingham had often marked off medication when she hadn't gone near his cell. She admitted she understood falsifying official forms was a criminal offense. (Id. at 17). Mr. Ridley was unable to urinate or defecate during the days in confinement.

The reach of the medical misconduct continued to have effects as he was finally moved to Memorial Hospital in Jacksonville. False and fabricated medical records showing Mr. Ridley walking around and receiving tests that he hadn't received and receiving medication he hadn't received and going more than four days without food or water, would not have been obvious on the face of the medical records and may have contributed to his death.

### B. The Doctrine of Delayed Discovery

The "delayed discovery" doctrine is available under Florida law in cases of

intentional abuse, among others. It operates to postpone accrual "until the plaintiff either knows or reasonably should know of the tortious act giving rise to the cause of action." *See Davis v. Monahan*, 832 So. 2d 708, 709-10 (Fla. 2002) (holding that the delayed discovery rule applies to fraud, products liability, professional and medical malpractice, and intentional torts based on abuse). *Donald Kipnis v. Bayerische Hypo-Und Vereinsbank, AG*, 784 F.3d 771, 778-79 (11th Cir. 2015).

The Eleventh Circuit has applied Florida's delayed discovery doctrine to federal cases. *Jones v. Childers*, 18 F.3d 899, 906 (11th Cir. 1994). Under Florida law, the delayed discovery doctrine does not "toll" the statute of limitation but may be applied to the time a cause of action "accrues." *Raie v. Cheminova, Inc.*, 221 F. Supp. 2d 1297, 1299 (M.D. Fla. 2002), aff'd, 336 F.3d 1278 (11th Cir. 2003). Under federal law, actions brought pursuant to § 1983 and the ADA accrue, or begin to run, "from the date the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights." *Ross*, 194 F. App'x at 744. Stated another way, once a person knows or has reason to know of an injury and knows who inflicted the injury, the statute of limitations begins to run as to the claims that may be available to that person. *Horsely v. Univ. of Ala.*, 564 F. App'x 1006, 1008 (11th Cir. 2014) (*citing Chappell v. Rich*, 340 F.3d 1279, 1283 (11th Cir. 2003)). "This rule requires a court first to identify the alleged injuries, and then to determine when plaintiff[]

could have sued for them." *Rozar v. Mullis*, 85 F.3d 556, 562 (11th Cir. 1996).

The injuries alleged, admittedly, include the fatal injuries to Mr. Ridley resulting from a use of force by Defendants but also include the emotional distress damages to his survivors. Federal claims based on excessive force are presumed to accrue on the date the force occurred – if the plaintiff had ample reason to know about it. *See Beck v. City of Muskogee Police Dep't*, 195 F.3d 553, 558 (10th Cir.1999) (explaining that claims arising from police action toward a criminal suspect, such as arrest and seizure, are presumed to accrue when the actions occur); *Nieves v. McSweeney*, 241 F.3d 46, 52 (1st Cir. 2001).

The directly injured party was Mr. Ridley. The denial of medical care and accommodations was part and parcel with the ultimately fatal beatings by corrections officers. Mr. Ridley was beaten by officers on September 8, 2017, and denied treatment and accommodations thereafter. During the interim, he was quadriplegic and unable to communicate with his family.

In wrongful death actions, the real parties in interest are the survivors. "The personal representative is merely a nominal party to a wrongful death action on behalf of a decedent; the estate and the decedent's survivors are the real parties in interest." *See DeVaughn v. DeVaughn,* 840 So.2d 1128 (Fla. 5DCA 2003); *Fla. Emergency Physicians–Kang and Assocs., M.D., P.A. v. Parker,* 800 So.2d 631 (Fla. 5DCA 2001)." *Bradley v. Sebelius*, 621 F.3d 1330, 1332 (11th Cir. 2010).

The delayed discovery doctrine is employed in Florida courts. "Florida courts . . . have broadly adopted the discovery principle, holding in a variety of legal contexts that the statute of limitations begins to run when a person is put on notice of his right to a cause of action." *Merle Wood & Associates, Inc. v. Trinity Yachts, LLC*, 857 F. Supp. 2d 1294, 1308 (S.D. Fla. 2012), aff'd, 714 F.3d 1234 (11th Cir. 2013). As noted in *Jones v. Childers*, 18 F.3d 899, 906 (11th Cir. 1994), Florida courts have relied on the reasoning in *Urie v. Thompson,* 337 U.S. 163, 69 S.Ct. 1018 (1949), holding in a variety of legal contexts that "the statute of limitations begins to run when a person has been put on notice of his right to a cause of action" and "under Florida law, a party is held to have been put on notice when he discovers, or reasonably should have discovered, facts alerting him of the existence of his cause of action." 18 F.3d at 906.

The only important difference between the foregoing cases and the instant case that should affect the application of the doctrine to a case under 42 USC 1983, is that this is precisely the kind of case § 1983, the Ku Klux Klan Act, was meant to remedy – where persons acting under color of state law used their badges to wreak terror on disfavored persons to deprive them of constitutional rights.

It should be kept in mind that under this theory Plaintiff does not seek to apply the delayed discovery doctrine to extend accrual in a wrongful death case, but to extend accrual in an excessive force case to the date that the real parties in

interest could be reasonably expected to have notice – at least to the date of the death. *See Raie v. Cheminova*, Inc., 221 F. Supp. 2d 1297 (11th Cir. 2002).

It should be noted that whether Plaintiff should have discovered the cause of action is a question of fact for a jury. *Jones, supra*, 18 F.3d at 907 (11th Cir. 1994) ("Whether the plaintiff discovered, or by due diligence should have discovered the existence of the cause of action . . . was a question of fact . . . and it has been held that genuine issues relating to such question of fact are to be determined by the trier of fact"). *Cimillo v. Austin,* 4:16cv584-RH/CAS (ND Fla. 2018); *Walton v. Florida Department of Corrections*, 3:16cv1130-BJD-JRK (MD Fla. Feb. 6, 2019).

### C. The Application of Equitable Tolling

Equity principles, based on the concepts of fairness, have somewhat looser standards, and argue that it is unfair demand that the statute of limitation clock start running at the time of the use of force given the circumstances of this case. The Court may look at legislative intent to determine whether the right to be free from excessive force should be enforceable more than four years after the incident. The remedial purpose of 42 USC §1983 should allow for equitable tolling.

The responding family member was told that her brother was in the hospital and was denied further information about the cause of his injuries. When she visited her brother, he was intubated, could not talk, and was manacled to the bed at all times. Ms. Gatewood returned home to Brooklyn and was informed a few

days later that Mr. Ridley had died. (Exh. 1 at ¶¶ 8, 9). Plaintiff had no basis on which to file a lawsuit and no knowledge of the subsequent investigation.

The family became aware of questionable circumstances of Mr. Ridley's death when an FDLE Agent contacted Ms. Gatewood as part of the investigation The FDLE investigation was not completed until February 25, 2019. Plaintiff acted with due diligence by seeking counsel shortly after being put on notice. Because Plaintiff acted with due diligence, the next factor is whether there were circumstances outside of Plaintiff's control and unavoidable. A one-month hospital stay, quadriplegic, bedridden and under constant scrutiny, before his death would render the decedent unable to file a claim. Likewise, the survivors were not put on notice of the way Craig Ridley died which would give rise to the cause of action of deadly force and failure to treat or accommodate. These circumstances are outside of the Plaintiff's control, and thus the statute of limitations or date of accrual should be equitably tolled accordingly.

The Eleventh Circuit has applied equitable tolling in certain circumstances. The court determines a time that "would have been fair for the statute of limitations to begin running on the Plaintiff's claims." *Arce v. Garcia,* 434 F.3d 1254 (11th Cir. 2006). Admittedly, equitable tolling is "an extraordinary remedy which should be extended only sparingly." *Id.* at 1261. Also, "The plaintiff bears the burden of showing that equitable tolling is warranted." *Bost v. Fed. Express*

*Corp.*, 372 F.3d 1233 (11th Cir. 2004). However, this is exactly the kind of case that the remedial purposes of 42 U.S.C. 1983 were designed to address.

The U.S. Supreme Court has held that for non-jurisdictional statutes of limitations, there is a "rebuttable presumption" in favor of equitable tolling. *Irwin v. Department of Veterans Affairs*, 498 U.S. 89, 95–96, 111 S.Ct. 453, 112 L.Ed.2d 435. The Court "ordinarily presume[s] federal limitations periods are subject to equitable tolling unless tolling would be inconsistent with the statute." *Holland v. Florida*, 560 U.S. 631, 660 (2010), *citing Young v. United States,* 535 U.S. 43, 49, 122 S.Ct. 1036, 152 L.Ed.2d 79 (2002). "That is especially true of limitations provisions applicable to actions that are traditionally governed by equitable principles—a category that includes habeas proceedings." *Id*. at 660. Specific circumstances of a case warranting equitable tolling may be hard to predict and demand special treatment on a case-by-case basis. *Id.* at 632. In fact, the Eleventh Circuit has held "the well-established rule is that absent congressional intent to the contrary, equitable tolling principles should be read into every federal statute of limitations." *Robinson v. Schafer*, 305 Fed. Appx. 629, 630 (11th Cir. 2008), Citing *United States v. Johnson,* 541 F.3d 1064, 1067 (11th Cir.2008).

The remedial purpose of 42 U.S.C. §1983 invites equitable tolling. The Supreme Court has instructed that in section 1983 actions, we borrow not only a state's limitations period but also its "tolling rules," *Board of Regents v. Tomanio*,

<mark>14</mark>

446 U.S. 478, 484–86, 100 S.Ct. 1790, 64 L.Ed.2d 440 (1980); see *Keating v. Carey*, 706 F.2d 377, 381–82 (2d Cir.1983), unless applying the state's tolling rules "would defeat the goals of the federal statute at issue," *Hardin v. Straub*, 490 U.S. 536, 539, 109 S.Ct. 1998, 104 L.Ed.2d 582 (1989). In *Hardin,* the Court held inmate's action, even though it was filed after three-year statute of limitations, was not time barred because state statutes suspending limitations periods for those under legal disability, including prisoners, until one year after disability has been removed was consistent with § 1983's remedial purpose. In determining whether a limitations period will be tolled, the Eleventh Circuit has held the following:

> The basic question to be answered in determining whether, under a given set of facts, a statute of limitations is to be tolled is one of legislative intent whether the right shall be enforceable after the prescribed time; the court gleans legislative intent from the purposes and policies underlying the limitation provision, the statute itself, and the remedial scheme developed for the enforcement of the rights given by the statute.

*Arce* at 1254.

It is fair enough to infer, when a statute of limitations says nothing about equitable tolling, that Congress did not displace the default rule. In this case, 42 U.S.C. §1988 indicates that the statute of limitations for a constitutional violation such as deadly force borrows from Chapter 95.11, Florida Statutes. Thus, a four-year statute of limitations governs the claims. Chapter 95.11 has enumerated instances in which delayed discovery is appropriate, including only medical malpractice, professional malpractice, and intentional torts based on abuse of

minors and vulnerable adults, such as Plaintiff's decedent.[3] It has not enumerated the same for equitable tolling. The Eleventh Circuit has applied equitable tolling to other instances governed by Chapter 95.11, Florida Statutes.

However, the fact that a statute is "silent as to equitable tolling while containing one provision that expressly refers to a different kind of tolling" does not foreclose equitable tolling. *Holland v. Florida*, at 647–48. *See also Young v. United States,* 535 U.S. at 53, 122 S.Ct. 1036 (rejecting the argument that an "express tolling provision, appearing in the same subsection as the [limitations] period, demonstrates a statutory intent not to toll the [limitations] period"

Thus, 42 U.S.C. §1983 permits equitable tolling, even in borrowing from Chapter 95.11, Florida Statutes. Given that equitable tolling is not contrary to legislative intent, two factors must be shown based for it to be applicable, "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Holland v. Florida* at <u>632</u>, *citing Pace v. DiGuglielmo,* 544 U.S. 408, 418, 125 S.Ct. 1807 (2005).

In this case, both factors can be shown. Plaintiff displayed due diligence in

---

[3] Mr. Ridley was rendered quadriplegic within minutes of encountering Defendants Nettles and Jerrels. All the rest of the outrages visited upon him were inflicted on an grievously disabled adult and a jury could reasonably conclude that the sum total of those outrages, from being wrestled into a wheelchair and van instead of being strapped to a backboard and carried on a stretcher, to being allowed to fall on his face in his cell and being left without food, water, or medication for four days before finally being taken to the hospital and manacled to a bed. Perhaps because the manacles made it hard to turn him, his autopsy shows a large decubitus ulcer. (Exh. 5, Ridley Autopsy Report).

filing a lawsuit soon after being put on notice of the cause of action. In addition, there are extraordinary circumstances in that the Decedent was unable to file a lawsuit in the weeks prior to his death in the hospital. The survivors were unaware that the Decedent died as a result of injuries sustained from a beating.

### D. The Application of Equitable Estoppel

Two equitable doctrines may apply to extend the limitations period or preclude a defendant from asserting the defense—equitable tolling and equitable estoppel. The federal version of these doctrines is concisely explained in *Johnson v. Henderson*, 314 F.3d 409 (9th Cir.2002). "Equitable tolling" focuses on "whether there was excusable delay by the plaintiff: If a reasonable plaintiff would not have known of the existence of a possible claim within the limitations period, equitable tolling will serve to extend the statute of limitations for filing suit until the plaintiff can gather what information he needs." *Id*. at 414 (quotation omitted).

Equitable estoppel, on the other hand, focuses primarily on actions taken by the defendants that prevent a plaintiff from filing suit, in some cases through fraudulent concealment. While equitable tolling extends to circumstances outside both parties' control, the related doctrines of equitable estoppel and fraudulent concealment may bar a defendant from enforcing a statute of limitation when its own deception prevented a reasonably diligent plaintiff from bringing a timely claim. *See United States v. Beggerly*, 524 U.S. 38, 49–50, 118 S.Ct. 1862, 141

L.Ed.2d 32 (1998) (*Stevens, J., concurring*) (noting that these doctrines are distinct); *see generally* 2 C. Corman, Limitation of Actions §§ 9.1, 9.7 (1991). *Sebelius v. Auburn Reg'l Med. Ctr*., 568 U.S. 145, 164 (2013)

"When the fraud goes undiscovered because the defendant has taken positive steps after the commission of the fraud to keep it concealed, then the statute of limitations is tolled until the plaintiff actually discovers the fraud. 'Fraudulent concealment must consist of affirmative acts or representations which are calculated to, and in fact do, prevent the discovery of the cause of action.'" *In re Int'l Admin. Servs., Inc.*, 408 F.3d 689, 701 (11th Cir.2005) (*citations omitted*). *Eaton v. Keith*, 154 Fed. Appx. 844, 848 (11th Cir. 2005); *Cada v. Baxter Healthcare Corp*. 920 F.2d 446, 450–51 (7th Cir.1990)); *Lukovsky v. City & County of San Francisco*, 535 F.3d 1044, 1051 (9th Cir. 2008) "Equitable estoppel focuses primarily on the actions taken by the defendant in preventing a plaintiff from filing suit. " *Santa Maria v. Pacific Bell*, 202 F.3d 1170, 1176 (9th Cir. 2000). Equitable estoppel may be invoked "if the defendant takes active steps to prevent the plaintiff from suing in time," *id*. at 1176 (*quoting Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450 (7th Cir.1990)), such as by misrepresenting or concealing facts necessary to the claim, *id*. at 1177.

A jury could reasonably find that the equivocal actions of the officers who put Mr. Ridley in a wheelchair instead of calling for a backboard and stretcher, the

statements by RN Corey that she had spoken to Dr. Rodriguez and that he said he had conducted neurological tests and that Ridley had walked out of the clinic, or of the security staff who told LPN Kirkland that Ridley had walked to the clinic, like the false medication log entries by LPN Winningham, caused harm not only by the failure to treat but harm in that other medical providers would have been misled by the assumption that care had been provided that had not, that food and drink had been provided that had not, that neurological tests had been provided that had not, that observations that Mr. Ridley had been see walking on his own, that were false, affected his subsequent care. It should be noted that even after Mr. Ridley spent four days without food or liquids and seemed "lethargic," it took another 16 hours to get him to an acute care hospital. (Exh. 4 at 25).

    WHEREFORE, Plaintiff asks this Honorable Court to DENY the Motion.

Respectfully Submitted,    *s/James V. Cook*
JAMES V. COOK, ESQ., FBN 0966843
Law Office of James Cook
314 West Jefferson Street
Tallahassee, Florida 32301
(850) 222-8080; 850 561-0836 fax
cookjv@gmail.com

ATTORNEY FOR PLAINTIFF

I CERTIFY the pertinent parts of this Memorandum do not exceed 4880 words.

I CERTIFY the foregoing was filed electronically on 4/1/22 and served on all counsel registered with the CM/ECF electronic mail system:

    *s/James V. Cook*