UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

JATOON MOSS, as Personal
Representative for the ESTATE
OF CRAIG RIDLEY, on behalf of the
Estate and Survivors Jatoon Moss
and Gary Ridley,

        Plaintiff,

v.                           Case No. 3:21-cv-1026-MMH-MCR

RICKY D. DIXON, et al.,

        Defendants.

_____

**<u>ORDER</u>**

## I.    Status

Craig Ridley died while he was an inmate in the custody of the Florida

penal system. Ridley's daughter, Jatoon Moss, filed this case on behalf of

Ridley's estate and his survivors: Moss and her brother, Gary Ridley. Moss is

proceeding on a Second Amended Complaint for Damages (Doc. 70; SAC)

against Ricky Dixon, in his official capacity as the Secretary of the Florida

Department of Corrections (FDOC), and the following thirteen individuals who

worked at the Reception and Medical Center (RMC) at the time of the incident

forming the basis of Moss's claims: Captain William Jeffrey Jerrels, Sergeant

John E. Nettles, Captain Jacob Anderson, Lieutenant Jason Livingston, Sergeant John Nyitray, Sergeant Aaron Lewis, Sergeant Jon Eberlein, Sergeant Richard Flynn, Sergeant Steven Potosky, Officer Daniel Greene, Officer Royce Givens, and two John Does.[1] Moss raises the following claims:[2] (1) wrongful death against Defendants Nettles and Jerrels under Florida Statute section 768.16, et seq.; (2) excessive use of force/failure to intervene under 42 U.S.C. § 1983 against Defendants Nettles and Jerrels; (3) conspiracy under 42 U.S.C. § 1983 against all Defendants except Dixon and Givens; (4) deliberate indifference to excessive force under 42 U.S.C. § 1983 against Defendants Jerrels and Anderson; (5) failure to protect under 42 U.S.C. § 1983 against all Defendants except Dixon; (6) violations of the Americans with Disabilities Act (ADA) and Rehabilitation Act (RA) against Defendant Dixon; (7) abuse or neglect of a vulnerable adult pursuant to Florida Statute section 415.1111 against all Defendants except Dixon and the John Does; (8)

---

[1] The Court dismissed Moss's claims against Registered Nurse Amanda Corey, Licensed Practical Nurse Stephanie Winningham, and Dr. Jean Dure based on the parties' settlement. See Order (Doc. 92).

[2] The Court identifies the claims as titled by Moss but renumbers the Counts in the order they appear in the SAC, excluding the original Count VI (Failure to Treat) because that Count was only against the medical defendants who are no longer parties to this case. Thus, the numbering used in this Order may differ from the numbers in the SAC and the parties' filings.

intentional infliction of emotional distress (IIED) against all Defendants except Dixon; (9) negligent infliction of emotional distress (NIED) against all Defendants except Dixon; and (10) battery against Jerrels and Nettles. As relief, Moss seeks monetary damages and attorney's fees and costs.

Before the Court are the following Motions: (1) Defendants Anderson, Jerrels, Livingston, Nyitray, and Potosky's Motion to Dismiss (Doc. 80), in which Defendant Givens joined (Doc. 109) (collectively referred to as the Jerrels Defendants); (2) Defendant Dixon's Motion to Dismiss Count VII (Doc. 87); and (3) Defendants Nettles, Lewis, Eberlein, Greene, and Flynn's Motion to Dismiss (Doc. 88) (collectively referred to as the Nettles Defendants). Moss filed Responses (Docs. 96, 99, 100). With the Court's permission, the Jerrels Defendants filed a Reply (Doc. 106), as did Defendant Dixon (Doc. 113). The Court also granted Moss's request to file sur-replies, and Moss did so (Docs. 115, 118). Defendants Jerrels, Anderson, Livingston, Nyitray, and Potosky also filed a Notice of Supplemental Authority (Doc. 120).[3] The Motions to Dismiss are ripe for review.

---

[3] Given the number of documents relating to the Motions, for ease of reference, the Court cites to the document and page numbers as assigned by the Court's electronic case filing system.

## II.    Moss's Allegations in the SAC[4]

On September 8, 2017, Ridley was housed at RMC, where he worked in the kitchen. SAC at 6-7. Early that morning, Defendant "Nettles was verbally abusive to Ridley for 'being late' for kitchen duty." Id. at 7. "Ridley argued with Nettles about the issue, [and] Nettles is reported to have become further enraged because Ridley had answered back disrespectfully." Id. Nettles moved Ridley "to an area 'off-camera' to 'counsel' Ridley, which was a euphemism for excessive force." Id. "Nettles said Ridley was assaultive and that [Nettles] placed [Ridley] on the ground by himself but didn't remember much about the incident." Id. Nettles did have "a slight scratch on his left cheek." Id. at 9. Defendant Jerrels stated "that he assisted Nettles in using force on Ridley, who ended up on the ground face first." Id. at 7.

According to Moss, a "[h]and-held video showed that at 3:32 a.m., Ridley was lying in a fetal position, handcuffed, unmoving, with his face down in the grass outside Dorm A." Id. at 8. Jerrels stated "on camera that Sgt. Nettles was attempting to counsel Ridley on 'his attitude getting up to go to work for food

---

[4] In considering the Motions, the Court must accept all factual allegations in the SAC as true, consider the allegations in the light most favorable to Moss, and accept all reasonable inferences that can be drawn from such allegations. Hill v. White, 321 F.3d 1334, 1335 (11th Cir. 2003); Jackson v. Okaloosa Cnty., 21 F.3d 1531, 1534 (11th Cir. 1994). As such, the facts recited here are drawn from the SAC, and may well differ from those that ultimately can be proved.

service this morning at which time he struck Sgt. Nettles on the left-hand side of his face' and that he (Capt. Jerrels) 'assisted Sgt. Nettles in placing inmate on the ground.'" Id. Jerrels further stated that Ridley was "refusing to walk to go to medical." Id. Jerrels instructed correctional staff (not any of the named Defendants) to place Ridley in a wheelchair and take him to the medical department. Id. When staff did so, Ridley's "legs dangle[d] limply in the air" and "[h]e nearly fell out of the chair as it moved but an officer grabbed his shirt." Id. According to reports, officers reported that as Ridley was taken to medical, he stated, "'my neck is broke,'" and "'I'm paralyzed.'" Id.

A nurse then examined Ridley, but "[s]he did not do any neurological tests, even simple reflex tests, but cleared him for confinement." Id. at 10. The medical examination lasted about 15 minutes. Id. Nurse Corey acknowledged that "she should have done a pin-prick reflex test but did not," and "she didn't ask for [Ridley's] handcuffs to be removed because the officers 'would have laughed at her' since he was reported to have hit an officer." Id. "Nurse Corey scold[ed] Ridley for not getting out of his wheelchair into another chair." Id. at 11. Ridley reported that "'[t]hey hit my head against the wall.'" Id. The video shows Ridley's head hanging down to his chest, and he asks one of the guards

to "'push [his] head up.'" Id. A guard told Ridley, "'Your blood pressure and all is fine. You ain't paralyzed." Id.

Thereafter, Defendant Anderson and two other correctional sergeants transported Ridley to confinement. Id. at 13. Anderson reported that Nurse Corey "told them that Ridley could be transported to the main unit without any special medical precautions." Id. "Officers just manhandled Ridley out of the wheelchair into the van." Id. The video reflects "Ridley['s] legs swinging limply as he is moved from the wheelchair to the transport van and his left leg slams against the van door." Id. "When Ridley was moved to the main unit[,] he did not go through the medical department but was moved directly to a holding cell in confinement." Id. at 14. Ridley was alone in an unmonitored holding cell for four hours. Id.

Ridley was moved to confinement without the proper paperwork. Id. at 14-15. Defendant "Lewis oversaw Ridley's DC-221 paperwork which was purportedly signed by Ridley though Ridley could not have written his signature." Id. at 15. The Florida Department of Law Enforcement (FDLE) "concluded [Ridley's signature] may have been forged by Officer Jeremy Bennett." Id.

6

Defendants Nyitray and Greene moved Ridley to a confinement cell and placed him on the toilet. Id. "Ridley then fell to the floor face-first and lay in a pool of blood for hours." Id. Defendants Givens, Greene, and Nyitray were informed that Ridley needed help, but none of them took any action to assist Ridley. Id. at 15, 20. "Eventually, Ridley was taken to see on-duty RN Kelly Strama who concluded he suffered paralysis and sent him to Urgent Care for evaluation." Id. at 15. Defendant Lewis took Ridley to the Urgent Care clinic in a wheelchair. Id. Nurse Kirkland did not complete the proper paperwork because Ridley "'was going to die of the cancer on his neck anyway.'" Id.

Dr. Dure saw Ridley and reported that "Ridley's neurological tests were normal, and he was able to grab Dr. Dure's fingers and he saw Ridley walk." Id. at 16. Subsequently, Dr. Dure reported "that he was provided the information that Ridley had walked to Urgent Care." Id. Dr. Dure cleared Ridley to return to confinement. Id.

Defendants Lewis and Eberlein "returned Ridley to a confinement cell and arranged his body on the bed so it looked like he was sitting up." Id. Ridley remained in the same position for four days. Id. At least one inmate informed Defendant Livingston of Ridley's condition. Id. "The day Ridley got to confinement, Livingston contacted an inmate to tell him he was going to give

him a cellmate to 'take care of.' Livingston used to pay the inmate in cigarettes to beat up inmates. The inmate declined." Id.

On September 9, 2017, "Ridley was checked on 23 times: once by Nyitray; eight times by Givens (including all three meals)[;] eight times by Green[;] and seven [times] by Underwood. All said there was nothing unusual but Ridley hadn't moved." Id. at 17. The next day, September 10, 2017, "Ridley was checked on 20 times that shift; 13 times by Givens, including all three meals[;] four times by Greene[;] twice by Nyitray[;] and once by Mallard." Id. Givens acknowledged that the paperwork completed did not reflect that Ridley had refused nine consecutive meals. Id. at 17-18. On September 11, 2017, "Ridley was checked on 18 times. [Defendant] Flynn did security checks on Ridley 14 times and served all three meals and took them away untouched." Id. at 18. Livingston checked on Ridley twice and Combee checked on Ridley four times (including once with Flynn). Id. "Flynn would have seen that each time Ridley was propped up on his bunk in just the same position as the time before, unmoving and without food." Id. During the evening shift, "Ridley was checked on 23 times[,] . . . 11 times by [Defendant] Potosky, nine times by [Officer] Thomas Welsh, and once by [Officer] Bobby Reeves." Id. Ultimately, Ridley "went five days without food or water or basic hygiene," but "[a]ll the prison

records were fabricated to make it look like he was being treated like an able-bodied prison inmate, able to walk and sign documents." Id. at 18-19.

Ridley was taken back to Urgent Care on September 12, 2017. Id. at 19. "Later that day it was decided to send him to Memorial Hospital in Jacksonville, but he wasn't actually moved until early" the next morning. Id. "Because RMC paperwork was fabricated or missing, medical providers at Memorial Hospital were unable to get a clear understanding of what had happened to Ridley and were unable to treat him appropriately." Id. at 22. Ridley eventually died at the Hospital on October 12, 2017. Id. Dr. Pfalzgraf performed an autopsy and "found the cause of death as 'complications of quadriplegia' with spinal cord contusions due to blunt impact to the head and neck." Id. Dr. Pfalzgraf ruled the death a "'homicide.'" Id. Prison staff at RMC "spread the rumor that Ridley had 'died of cancer.'" Id.

Moss also summarizes the FDLE investigation, see id. at 23-26, and data related to "abuse and retaliation" in the Florida prison system, id. at 26-28. Attached to the SAC is an "Affirmation" under penalty of perjury from Ridley's sister, Diane Ridley Gatewood. Ms. Gatewood avers in pertinent part:

> I was the person designated as the emergency contact for my brother, Craig Alan Ridley, who was serving a term in prison in Florida.

On September 21, 2017, Glenda Webb, a social worker at Jacksonville Memorial Hospital called and left a message (phone number (386) 496-7277) asking that I contact her about Craig Ridley. The message stated that I needed to verify my identity before any information would be released. No one from the [FDOC] ever told me how Craig's injury occurred.

On September 22, 2017, I contacted Ms. Webb about my brother and she stated that Craig was in serious condition in the hospital's ICU. She did not say why. On September 23, 2017, I traveled from Brooklyn, New York on [a] 6:00 AM flight to Jacksonville, Florida. I arrived at the hospital at 11:00 AM.

I spoke with various hospital personnel about Craig's condition from September 23 to September 26. I spoke with Dr. Hernan Chang, the supervising physician, Dr. Rodas, the attending physician, Dr. Robinson, gastroenterologist[,] and Dr. Shaw, acute care physician. None of the physicians told me that Craig was suffering from a fractured neck precipitated by an injury that occurred at RMC. I was told that Craig had a mass on his upper spine and cervix that was cancerous. "That no biopsies were done due to his weaken [sic] condition." One of the physicians indicated "that there was temporary paralysis (quadriplegia) until neurosurgery." Craig had assisted respiration, blood pressure and possible brain damage. I said my mother was suffering from breast cancer and was hospitalized. I asked whether he was "brain dead." I was informed that he was not brain dead. I was told by an attending nurse that he flatlined three times upon early arrival at the hospital.

On September 26, 2017, Craig underwent a surgical procedure and I was not allowed to visit that

day. I was able to visit him daily during the designated visiting hours established by the [FDOC] on September 23, 24, 25 and 27.

I was able to obtain an extended visitation waiver given his critical condition. During visitation with Craig in the ICU, he was intubated and could not speak. He was also manacled to the bed. I thought that was cruel and unnecessary given his grave condition. There were two or three guards in the room with us.

My brother didn't appear to be lucid which is why I asked if he was brain dead. Once or twice he blinked his eyes. I'm not sure if he knew who was in the room. I just chatted. I told him I loved him and our mother loved him. I didn't think I could elicit any information from him about what happened. Craig appeared gravely injured but no one told me the cause of his injuries.

On September 28, 2017, while at the Jacksonville Airport, I received a telephone call from I believe Dr. Chang indicating that Craig had rallied and his condition improved. I was told that Craig received medicine through a feeding tube on September 29, 2017. On October 4, 2017, I received a call from Glenda Webb indicating that he was "holding his own and was a fighter and maybe my visit gave him the will to live." Again, no one told me what had happened to him.

I was called by the hospital and told that Craig died on October 12, 2017, at 4:30 AM at Jacksonville Memorial Hospital.

I learned something about the basis of Craig's death upon issuance of the death certificate which I received on December 10, 2017, indicating death by

"homicide caused by complications of quadriplegia, dislocation of c4-c5 vertebrae with spinal cord contusion, blunt impact to head and neck." At that time I was still not informed who caused Craig's death or how it happened.

On January 17, 2018, I received an e-mail from Special Agent Supervisor Matt Walsh of the Florida Department of Law Enforcement (FDLE). He wrote that this was still an active criminal investigation and that he might not be able to answer all my questions but he thought I might be able to assist the investigation. I subsequently spoke with FDLE investigators. I did not receive sufficient information to provide a clear idea of what had happened to Craig.

I finally received the FDLE Summary Report on November 2, 2020. I received the full Investigative Report on February 21, 2021. It was at that point I was able to get a fairly comprehensive picture of what had happened to Craig.

Doc. 70-1 at 2-3 (paragraph enumeration omitted).

### III.   Motion to Dismiss Standard

In ruling on a motion to dismiss, the Court must accept the factual allegations set forth in the complaint as true. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508 n.1 (2002); see also Lotierzo v. Woman's World Med. Ctr., Inc., 278 F.3d 1180, 1182 (11th Cir. 2002). In addition, all reasonable inferences should be drawn in favor of the plaintiff. See Randall v. Scott, 610 F.3d 701, 705 (11th Cir. 2010). Nonetheless,

the plaintiff must still meet some minimal pleading requirements. <u>Jackson v.</u>
<u>BellSouth Telecomm.</u>, 372 F.3d 1250, 1262-63 (11th Cir. 2004). Indeed, while
"[s]pecific facts are not necessary[,]" the complaint should "'give the defendant
fair notice of what the . . . claim is and the grounds upon which it rests.'"
<u>Erickson v. Pardus</u>, 551 U.S. 89, 93 (2007) (per curiam) (quoting <u>Bell Atl. Corp.</u>
<u>v. Twombly</u>, 550 U.S. 544, 555 (2007)). Further, the plaintiff must allege
"enough facts to state a claim to relief that is plausible on its face." <u>Twombly</u>,
550 U.S. at 570. "A claim has facial plausibility when the pleaded factual
content allows the court to draw the reasonable inference that the defendant
is liable for the misconduct alleged." <u>Iqbal</u>, 556 U.S. at 678 (citing <u>Twombly</u>,
550 U.S. at 556).

A "plaintiff's obligation to provide the grounds of his entitlement to relief
requires more than labels and conclusions, and a formulaic recitation of the
elements of a cause of action will not do[.]" <u>Twombly</u>, 550 U.S. at 555 (internal
quotations omitted); <u>see also</u> <u>Jackson</u>, 372 F.3d at 1262 (explaining that
"conclusory allegations, unwarranted deductions of facts or legal conclusions
masquerading as facts will not prevent dismissal") (internal citation and
quotations omitted). Indeed, "the tenet that a court must accept as true all of
the allegations contained in a complaint is inapplicable to legal conclusions[,]"

which simply "are not entitled to [an] assumption of truth." Iqbal, 556 U.S. at 678, 680. Thus, in ruling on a motion to dismiss, the Court must determine whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face[.]'" Id. at 678 (quoting Twombly, 550 U.S. at 570).

## IV.   Analysis

### a. Consideration of Documents Outside the Four Corners of the SAC

The Jerrels and Nettles Defendants request that the Court consider documents outside the four corners of Moss's SAC. Doc. 80 at 5-8; Doc. 109; Doc. 88 at 4 n.4. Specifically, Defendants contend that in response to an earlier motion to dismiss filed by former defendants Dure and Corey, Moss filed the following documents which she refers to in the SAC and which they contend are central to her claims: the medical examiner's report (Doc. 40-5), Ridley's medical records (Doc. 40-1), and the FDLE report (Doc. 40-4). Doc. 80 at 5-6.

"'Under the doctrine of incorporation by reference, [courts] may also consider documents attached to the motion to dismiss if they are referred to in the complaint, central to the plaintiff's claim, and of undisputed authenticity.'" Luke v. Gulley, 975 F.3d 1140, 1144 (11th Cir. 2020) (quoting Hi-Tech Pharms., Inc. v. HBS Int'l Corp., 910 F.3d 1186, 1189 (11th Cir. 2018)). Here, although

14

Moss may not dispute the authenticity of the medical examiner's report, Ridley's medical records, or the FDLE report, that does not necessarily mean that at this point in the litigation, the Court should consider or interpret the contents of the documents. This is so especially given that Moss asserts some medical records and other reports were fabricated. And one portion of the FDLE report Defendants rely on is a summary of what an inmate (Moise Cherette) told FDLE Special Agent Mauer about statements Ridley made to Cherette. Indeed, the Court agrees with Moss that "Defendants ask the Court to use those documents to resolve the parties' competing factual question of when the statute of limitations accrued. That is not permitted at this stage." Doc. 99 at 5. Under these circumstances, the Court declines to consider and interpret the documents as Defendants request.

The Court, however, will consider Ms. Gatewood's Affirmation because it is attached to the SAC. But the Court declines to interpret the Affirmation in the manner that Defendants suggest at this stage of the litigation. First, Defendants heavily rely on the fact that Ms. Gatewood was Ridley's "emergency contact" and they repeatedly assert, without citation to authority, that as such, Ms. Gatewood had access to Ridley's medical records. But simply because Ms. Gatewood was Ridley's "emergency contact" does not necessarily

mean she had authority to access his medical records at the hospital or the prison. Second, that Ms. Gatewood believed Ridley was in "serious condition" and "appeared gravely injured" does not equate to her knowing that Ridley was subjected to force at the prison which caused his injuries. Instead, she avers that nobody told her that Ridley's injuries resulted from an incident at the prison. The statements in Ms. Gatewood's Affirmation do not substantively conflict with the allegations of the SAC. Thus, the Court finds Defendants' assertions in this regard unavailing.

### b. Statute of Limitations

The Jerrels and Nettles Defendants argue that Moss's § 1983 and state law claims raised in Counts I (wrongful death), II (excessive force/failure to intervene), III (conspiracy), IV (deliberate indifference to excessive force), V (failure to protect), VII (abuse or neglect of vulnerable adult), VIII (IIED), IX (NIED), and X (Battery) are barred by the statute of limitations and should be dismissed. See Doc. 80 at 22-24; Doc. 109; Doc. 88 at 4-8. Likewise, Defendant Dixon argues that Moss's sole claim against him under the ADA and RA (Count VI) should be dismissed because it was filed beyond the four-year statute of limitations. See Doc. 87 at 8-18.

i.  <u>Section 1983 and ADA/RA Claims</u>

The statute of limitations applicable to Moss's § 1983 and ADA/RA claims is four years. The parties disagree as to when the statute of limitations began to run, as well as whether, if this case was filed beyond the statute of limitations, Moss is entitled to the benefit of the doctrine of equitable tolling.

"Federal law governs when a federal civil rights claim accrues." <u>Karantsalis v. City of Miami Springs, Fla.</u>, 17 F.4th 1316, 1322 (11th Cir. 2021) (citing <u>Rozar v. Mullis</u>, 85 F.3d 556, 561 (11th Cir. 1996)). "Generally, 'the statute of limitations does not begin to run until the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights.'" <u>Lovett v. Ray</u>, 327 F.3d 1181, 1182 (11th Cir. 2003) (quoting <u>Rozar</u>, 85 F.3d at 561-62); <u>see</u> <u>Doe as Next Friend of Doe #6 v. Swearingen</u>, 51 F.4th 1295, 1303 (11th Cir. 2022) (same). "Plaintiffs must know or have reason to know that they were injured, and must be aware or should be aware of who inflicted the injury. This rule requires a court first to identify the alleged injuries, and then to determine when plaintiffs could have sued for them." <u>Karantsalis</u>, 17 F.4th at 1322-23 (internal quotations and citations omitted).

> That is not to say that a plaintiff must know or suffer
> the full extent of his injury before his cause of action

> accrues and the statute of limitations begins to run.
> Rather, a plaintiff must know or have reason to know
> that he was injured to some extent. <u>Rozar</u>, 85 F.3d at
> 562. . . . Generally, the injury inquiry will be a highly
> fact-specific determination.

<u>Id.</u> at 1323.

As to Moss's excessive force claim (Count II), deliberate indifference to excessive force claim (Count IV), failure to protect claim (Count V), and ADA/RA claim (Count VI), the injuries occurred between September 7 and 13, 2017 or—at the latest—on the date of Ridley's death (October 12, 2017). As to Moss's conspiracy claim (Count III), the date is not as clear, as Moss includes allegations regarding the alleged coverup after Ridley's death. Regardless, when Moss could have sued for Ridley's injuries as alleged in these Counts is factually disputed.

At this juncture, the Court must take as true Moss's allegations in the SAC. In doing so, the Court cannot find that it is facially apparent from the SAC that Ridley, in light of his injuries, was "a person with a reasonably prudent regard for his rights." Ridley apparently thought at the time of the incident that he was paralyzed, but he was told by medical and correctional staff that he was not. He was left for about five days in his cell unable to move, eat, drink, or engage in personal hygiene. Nor was he able to file a grievance,

write a letter, make a phone call, or otherwise communicate with any family members "who could champion his rights after his death." <u>Walton for Est. of Smith v. Fla. Dep't of Corr.</u>, No. 3:16-cv-1130-J-39JRK, 2019 WL 462844, at *3 (M.D. Fla. Feb. 6, 2019).[5] Additionally, as the Court previously found, "to the extent Defendants intentionally withheld information or misled [Moss] as to the cause of her [father's] death, fairness dictates [Moss] be afforded an opportunity to sufficiently present her arguments as to whether she timely filed her claims considering all relevant facts and applicable legal and equitable principles." <u>Id.</u> Thus, the questions of when the claims accrued and whether Moss timely filed such claims, along with whether Moss is entitled to equitable tolling, are decisions best left for after discovery when all facts are fully developed. <u>See</u> <u>Karantsalis</u>, 17 F.4th at 1319-20 ("We have provided that dismissal for failure to state a claim on statute of limitations grounds is appropriate only if it is apparent from the face of the complaint that the claim is time-barred." (internal quotations and citations omitted)). Thus, Defendants'

---

[5] The Court notes that although decisions of other district courts are not binding, they may be cited as persuasive authority. <u>See</u> <u>Stone v. First Union Corp.</u>, 371 F.3d 1305, 1310 (11th Cir. 2004) (noting that, "[a]lthough a district court would not be bound to follow any other district court's determination, the decision would have significant persuasive effects."). While there are differences between Ridley and the decedent in <u>Walton</u>, the Court finds the reasoning of the <u>Walton</u> case to be persuasive.

requests to dismiss these claims as barred by the statute of limitations are due to be denied.

### ii. State Law Claims

Regarding Moss's wrongful death claim (Count I), "the Florida statute of limitations for a wrongful-death action is two years." Taylor v. R.J. Reynolds Tobacco Co., 441 F. App'x 664, 665 (11th Cir. 2011) (citing Fla. Stat. § 95.11(4)(d)). As to the remaining state law claims, a four-year statute of limitations applies. See Doc. 80 at 22-24; Doc. 88 at 4-8. "In Florida, a cause of action for wrongful death accrues on the date of death." Fulton Cnty. Adm'r v. Sullivan, 753 So. 2d 549, 552 (Fla. 1999). Ridley died on October 12, 2017, and Moss did not file this lawsuit until October 12, 2021. Thus, the wrongful death claim is untimely unless some principle of tolling applies.

Moss argues that two doctrines apply to make these state law claims timely: fraudulent concealment and equitable estoppel. Doc. 99 at 7-16. "Fraudulent concealment requires the defendants to engage in the willful concealment of the cause of action using fraudulent means to achieve that concealment." Raie v. Cheminova, Inc., 336 F.3d 1278, 1282 n.1 (11th Cir. 2003) (citation omitted). "In order to establish fraudulent concealment, plaintiff must allege and establish 1) successful concealment of the cause of

action, 2) fraudulent means to achieve that concealment, and 3) plaintiff exercised reasonable care and diligence in seeking to discover the facts that form the basis of his claim." <u>Burr v. Philip Morris USA Inc.</u>, No. 8:07-cv-1429-MSS, 2012 WL 5290164, at *3 (M.D. Fla. Sept. 28, 2012). Notably, "[c]laims of fraudulent concealment involve highly individualized questions of fact." <u>Hall v. Burger King Corp.</u>, No. CIV A.890260CIVKEHOE, 1992 WL 372354, at *9 n.8 (S.D. Fla. Oct. 26, 1992) (quotations and citation omitted).

"Equitable estoppel is based on principles of fair play and essential justice and arises when one party lulls another party into a disadvantageous legal position." <u>Major League Baseball v. Morsani</u>, 790 So. 2d 1071, 1076 (Fla. 2001). It "presupposes a legal shortcoming in a party's case that is directly attributable to the opposing party's misconduct," and "bars the wrongdoer from asserting that shortcoming and profiting from his or her own misconduct." <u>Id.</u> at 1077. In that way, equitable estoppel "functions as a shield, not a sword, and operates against the wrongdoer, not the victim." <u>Id.</u>

Defendants argue that the "death certificate clearly nullifies [Moss's] allegations and shows that 'the family' had sufficient knowledge that Mr. Ridley had likely been harmed by the defendants' conduct which is all that is required to find the alleged multiple causes of action accrued." Doc. 106 at 8.

The Court disagrees, at this stage, that the death certificate is as definitive as Defendants assert. Considering the record, the Court finds that like Moss's federal claims, Moss has alleged enough regarding the state law claims to survive a motion to dismiss on statute of limitations grounds.

### c. Conspiracy – Intracorporate Conspiracy Doctrine[6]

The Nettles Defendants argue that Moss's conspiracy claim should be dismissed due to the intracorporate conspiracy doctrine or alternatively, because Moss fails to state a claim. See Doc. 88 at 11-15.[7] In response, Moss argues that the doctrine does not apply because (1) the former medical defendants, who are alleged to be a part of the conspiracy, may not be considered FDOC employees; and (2) "several exceptions," including the

---

[6] In the section of their Motion arguing that Moss's failure to protect claim should be dismissed based on qualified immunity, the Nettles Defendants "ask the Court to apply the reasoning here concerning qualified immunity to the Section 1983 Conspiracy counts." Doc. 88 at 15 n.5. The Court declines to consider an argument that Defendants fail to adequately raise.

[7] The Jerrels Defendants state that they "adopt the reasoning in co-defendants' motions to dismiss as to why this [conspiracy] count should also be dismissed." Doc. 80 at 18-19. However, they fail to identify which co-defendants' arguments they adopt. This incorporation by reference is inappropriate. Local Rule 3.01(a) requires the movant to state the precise relief requested and grounds therefor "in a single document no longer than twenty-five pages inclusive of all parts . . .," and the Court is not inclined to sift through various motions to decipher what arguments the Jerrels Defendants seek to join.

criminal conspiracy exception, apply to this case and preclude application of the intracorporate conspiracy doctrine. See Doc. 100 at 8-11.

"The intracorporate conspiracy doctrine holds that acts of corporate agents are attributed to the corporation itself, thereby negating the multiplicity of actors necessary for the formation of a conspiracy." McAndrew v. Lockheed Martin Corp., 206 F.3d 1031, 1036 (11th Cir. 2000). The doctrine recognizes that "[a] corporation cannot conspire with its employees and its employees, when acting within the scope of their employment, cannot conspire among themselves." McPhie v. Yeager, 819 F. App'x 696, 701 (11th Cir. 2020); see Dickerson v. Alachua Cnty. Comm'n, 200 F.3d 761, 767 (11th Cir. 2000) ("The reasoning behind the intracorporate conspiracy doctrine is that it is not possible for a single legal entity consisting of the corporation and its agents to conspire with itself, just as it is not possible for an individual person to conspire with himself.").

While all remaining Defendants were FDOC employees, Moss argues that the former medical defendants, who are alleged to be a part of the conspiracy, may not be considered FDOC employees, and thus are not employees of the same corporation for purposes of the intracorporate conspiracy doctrine. Thus, the doctrine may not be factually applicable.

Regardless, taking Moss's allegations as true, this case may present an exception to the doctrine with respect to potential criminal conduct. Thus, the Court declines to apply the intracorporate conspiracy doctrine to bar Moss's claim at this stage of the proceeding. See Logan v. Johnson, No. 3:13-cv-532-J-39MCR, 2014 WL 5473561, at *5-6 (M.D. Fla. Oct. 28, 2014) (denying a motion to dismiss based on the intracorporate conspiracy doctrine, finding that the case may present an exception based on potential criminal conduct); Newsome v. Lee Cnty., Ala., 431 F. Supp. 2d 1189, 1203-05, 1203 n.7 (N.D. Ala. 2006) (denying a motion to dismiss and declining to apply the intracorporate conspiracy doctrine to a conspiracy claim brought by an inmate against sheriff's department employees, finding applicable the criminal conspiracy exception and the personal stake exception). Defendants' Motion is due to be denied in this regard.

### d. Conspiracy – Failure to State a Claim

The Nettles Defendants argue that Moss has failed to state a conspiracy claim because "[Moss] provides no factual basis to support a conspiracy claim." See Doc. 88 at 13, 15. "To state a claim for conspiracy under § 1983, a plaintiff must allege that (1) the defendants reached an understanding or agreement that they would deny the plaintiff one of his constitutional rights; and (2) the

24

conspiracy resulted in an actual denial of one of his constitutional rights." Weiland v. Palm Beach Cnty. Sheriff's Off., 792 F.3d 1313, 1327 (11th Cir. 2015) (citing Hadley v. Gutierrez, 526 F.3d 1324, 1332 (11th Cir. 2008)). Considering the allegations in the SAC, taken as true, the Court finds Moss has sufficiently stated a conspiracy claim. Thus, the Nettles Defendants' Motion is due to be denied to the extent it seeks dismissal of the conspiracy claim.

### e. Wrongful Death Claim Subsumes State Law Claims

The Jerrels Defendants argue that Moss's wrongful death claim subsumes his battery, NIED, and IIED claims.[8] See Doc. 80 at 21. "An individual's claims for personal injuries not causing death survive the decedent's death and may be prosecuted by the personal representative as a survival claim, which is a distinct cause of action from a wrongful death claim." Homaday v. Smith & Nephew, Inc., 994 F. Supp. 2d 1264, 1267 (M.D. Fla. 2014) (citing Fla. Stat. § 46.021). However,

---

[8] The section of the Jerrels Defendants' Motion raising this argument addresses only the battery, NIED, and IIED claims. See Doc. 80 at 21. In Moss's Response and the Jerrels Defendants' Reply, they also refer to other Counts. See Doc. 99 at 17; Doc. 106 at 3. The Court addresses only the Counts the Jerrels Defendants seek to dismiss in their Motion. Additionally, to the extent the Jerrels Defendants seek dismissal of the IIED and NIED claims for failure to state a claim in their Reply, Doc. 106 at 6-7, the Court declines to address such arguments because they were not properly raised.

"[w]hen a personal injury to the decedent results in death, no action for the personal injury shall survive, and any such action pending at the time of death shall abate." § 768.20, Fla. Stat. [emphasis removed]; see also Mucciolo v. Boca Raton Reg'l Hosp., Inc., 824 F. App'x 639, 643-44 (11th Cir. 2020) ("[A]ny personal injury claims alleging wrongdoing that ultimately resulted in the death of the decedent are extinguished upon death, leaving the statutory wrongful death claim as the only avenue for damages against the tortfeasor."). "[A]lternative theories of relief [are] subsumed in the wrongful death claim, and no claim, other than the statutory wrongful death claim, [can] be brought or require[s] consideration by the district court." Mucciolo, 824 F. App'x at 644; see Banuchi v. City of Homestead, No. 20-25133-Civ-Scola, 2021 WL 2333265, at *7 (S.D. Fla. June 8, 2021) (Scola, J.) (holding Florida's Wrongful Death Act precluded personal injury torts where defendant's actions resulted in decedent's death); see also Shehada v. Tavss, 965 F. Supp. 2d 1358, 1378 (S.D. Fla. 2013) (Lendard, J.) ("[W]hen death is the result of a personal injury, the law of Florida essentially substitutes a statutory wrongful death action for the personal injury action[.] (quoting Niemi v. Brown & Williamson Tobacco Corp., 862 So. 2d 31, 33 (Fla. 2d DCA 2003))).

Groover v. Polk Cnty. Bd. of Cnty. Commissioners, 570 F. Supp. 3d 1134, 1153-54 (M.D. Fla. 2021) (order on motions for summary judgment).

As to the battery claim, Moss specifically pleads that claim in the "alternative to her cause of action for wrongful death." SAC at 46. Regarding Moss's IIED and NIED claims, Moss seeks damages for Ridley's injuries that did not result in his death. See Doc. 99 at 19. Indeed,

> [t]he survival statute allows the person to recover "for injuries that did not result in the death of the plaintiff-decedent," and the Wrongful Death Act allows for "wrongful death damages where the injury to the decedent ultimately resulted in death." <u>Capone</u>, 116 So.3d at 375-76.[9] While both causes of action are necessarily "inconsistent and [in the] alternative," <u>Smith v. Lusk</u>, 356 So.2d 1309, 1311 (Fla. 2d DCA 1978), when "the cause of the decedent's death may be disputed by the parties," a plaintiff may plead both, <u>Capone</u>, 116 So.3d at 377.

<u>In re Engle Cases</u>, 45 F. Supp. 3d 1351, 1362 (M.D. Fla. 2014) (footnote omitted). At this stage of the litigation, the Court declines to find that the wrongful death claim subsumes the battery, IIED, and NIED claims. Therefore, the Jerrels Defendants' Motion will be denied to the extent they argue that the wrongful death claim subsumes the battery, IIED, and NIED claims.

### f. ADA/RA – Failure to State a Claim

Defendant Dixon argues that Moss's claim against him should be dismissed due to Moss's failure "to allege that the decedent was discriminated against 'because of' his alleged disability.'" Doc. 87 at 19. Instead, according to Dixon, Moss's allegations suggest that "there was systematic mistreatment of all inmates across the state[] of Florida, and that [Ridley's] alleged

---

[9] <u>Capone v. Philip Morris USA, Inc.</u>, 116 So. 3d 363 (Fla. 2013).

mistreatment was consistent with the general mistreatment of inmates." Doc. 113 at 9. Dixon also argues that the SAC "makes clear that any mistreatment suffered by [Ridley] was part of a conspiracy in which the other defendants 'pursued their own, independent criminal interests for mutual protection which were inconsistent with the interest of FD[O]C.'" Id. (emphasis omitted). In response, Moss argues that she has sufficiently stated a claim "under a failure to accommodate theory." Doc. 96 at 16. Moss further contends that "Rule 8(d) allows [Moss] to plead inconsistently and in the alternative." Doc. 118 at 1.

Regarding claims under the ADA and RA:[10]

> Under Title II of the ADA, public entities are prohibited from discriminating against individuals with disabilities or denying them services because of their disabilities. See 42 U.S.C. § 12132. "Only public entities are liable for violations of Title II of the ADA." Edison v. Douberly, 604 F.3d 1307, 1308 (11th Cir. 2010). State prisons are public entities for purposes of the ADA. Pa. Dep't of Corr. v. Yeskey, 524 U.S. 206, 210 (1998). . . .

---

[10] "With the exception of its federal funding requirement, the RA uses the same standards as the ADA, and therefore, cases interpreting either are applicable and interchangeable." Badillo v. Thorpe, 158 F. App'x 208, 214 (11th Cir. 2005) (citing Cash v. Smith, 231 F.3d 1301, 1305 & n. 2 (11th Cir. 2000)); see also Palmer v. McDonald, 824 F. App'x 967, 968 n.1 (11th Cir. 2020) ("The [RA] expressly adopts the [ADA's] provisions and standards for determining violations of the law. We therefore cite directly to the ADA and apply our precedents interpreting that statute.").

<u>Owens v. Sec'y, Fla. Dep't of Corr.</u>, 602 F. App'x 475, 477-78 (11th Cir. 2015) (some internal citations modified); <u>see</u> <u>Shotz v Cates</u>, 256 F.3d 1077, 1079 (11th Cir. 2001).

> To state a claim under Title II, [a plaintiff must] allege "(1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of [his] disability."

<u>Ingram v. Kubik</u>, 30 F.4th 1241, 1256-57 (11th Cir. 2022) (quoting <u>Silberman v. Miami Dade Transit</u>, 927 F.3d 1123, 1134 (11th Cir. 2019)).

Here, accepting Moss's allegations as true, the Court finds that she has sufficiently stated claims under the ADA and RA. While Moss's claims may ultimately fail if challenged by a properly supported motion for summary judgment or at trial, at this point, the ADA and RA claims will proceed. Thus, Defendant Dixon's Motion is due to be denied.

### g. Failure to Protect – Failure to State a Claim

The Nettles Defendants argue that Moss's failure to protect claim (Count V) should be dismissed based on qualified immunity. Doc. 88 at 15-18. Specifically, Defendants contend that "[t]here was not a clear right that was violated by these Defendants," who "were all acting within the scope of their

duties." Id. at 17, 18. Moss argues that "[q]ualified immunity should not apply to section 1983 claims,"[11] and regardless, Defendants are not entitled to it. Doc. 100 at 12-17.

"Qualified immunity protects from civil liability government officials who perform discretionary functions if the conduct of the officials does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Nolin v. Isbell, 207 F.3d 1253, 1255 (11th Cir. 2000) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). As a result, the qualified immunity defense protects from suit "'all but the plainly incompetent or those who knowingly violate the law.'" Carr v. Tatangelo, 338 F.3d 1259, 1266 (11th Cir. 2003) (citation omitted). Indeed, as "'government officials are not required to err on the side of caution,' qualified immunity is appropriate in close cases where a reasonable officer could have believed that his actions were lawful." Lee v. Ferraro, 284 F.3d 1188, 1200 (11th Cir. 2002) (quoting Marsh v. Butler Cnty., Ala., 268 F.3d 1014, 1031 n.8 (11th Cir. 2001)).

To be entitled to qualified immunity, an official must first establish that his conduct fell within his discretionary authority. See Webster v. Beary, 228

---

[11] The Supreme Court and the Eleventh Circuit have routinely applied qualified immunity to section 1983 claims.

F. App'x 844, 848 (11th Cir. 2007). If the defendant so shows, the burden shifts to the plaintiff to show that qualified immunity is not appropriate using the two-prong test established by the Supreme Court in Saucier v. Katz, 533 U.S. 194, 201 (2001). In accordance with Saucier, the Court must ask whether the facts viewed in the light most favorable to the plaintiff "show the officer's conduct violated a constitutional right?" Id.; see also Hope v. Pelzer, 536 U.S. 730, 736 (2002); Beshers v. Harrison, 495 F.3d 1260, 1265 (11th Cir. 2007) (quoting Scott v. Harris, 550 U.S. 372, 377 (2007)). The court must also ask whether the right allegedly violated was clearly established at the time of the violation. Hope, 536 U.S. at 739; Saucier, 533 U.S. at 201; Scott, 550 U.S. at 377; Underwood v. City of Bessemer, 11 F.4th 1317, 1328 (11th Cir. 2021) ("we ask two questions: (1) whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right, and (2) if so, whether the right at issue was clearly established at the time of the defendant's alleged misconduct") (internal quotations omitted). The Court may consider these questions in whichever order it chooses, and qualified immunity will protect the defendant if the answer to either question is "no." Pearson v. Callahan, 555 U.S. 223, 232, 236 (2009); Underwood, 11 F.4th at 1328. Notably, "[b]ecause § 1983 'requires proof of an affirmative causal connection between the official's

acts or omissions and the alleged constitutional deprivation,' each defendant is entitled to an independent qualified-immunity analysis as it relates to his or her actions and omissions." Alcocer v. Mills, 906 F.3d 944, 951 (11th Cir. 2018) (quoting Zatler v. Wainwright, 802 F.2d 397, 401 (11th Cir. 1986)).

"[T]he eighth amendment's proscription against cruel and unusual punishment imposes a duty to provide reasonable protection" when a prison official becomes "aware of a threat to an inmate's health and safety." Brown v. Hughes, 894 F.2d 1533, 1537 (11th Cir. 1990). When prison officials are "deliberately indifferent to a known danger . . ., their failure to intervene offend[s] 'evolving standards of decency' [and] ris[es] to the level of a constitutional tort." Id. (citing Estelle v. Gamble, 429 U.S. 97, 105-06 (1976)).

The Court addresses the acts and omissions of each of the Nettles Defendants first. Regarding Defendant Nettles, Moss cites to the fact that "Nettles testified that he assisted in the use of force and did not prevent it." Doc. 100 at 16 (citing an Eleventh Circuit case discussing a failure to intervene claim). Moss has a separate failure to intervene claim against Defendant Nettles (Count II). Moss, however, also contends that Nettles knew Ridley needed a stretcher but failed to provide him with one. Id. This allegation, along with Moss's allegations relating to the incident as a whole, sufficiently state a

claim of a violation of a clearly established constitutional right. Thus, at this point, Nettles is not entitled to qualified immunity on the failure to protect claim.

According to Moss, Lewis oversaw Ridley's paperwork, which was purportedly signed by Ridley even though Ridley could not have written his signature. SAC at 15. The FDLE investigation concluded that Ridley's signature may have been forged by Officer Jeremy Bennett. Id. On September 8, 2017, Lewis escorted Ridley to Urgent Care, and the nurse stated she was told by an officer that Ridley walked to the clinic. Id.; see id. at 20 (alleging that "Lewis took Ridley to medical falsely conveying to the nurse and Dr. Dure that he had seen Ridley walk"). After Dr. Dure cleared Ridley, Lewis and Eberlein returned Ridley to a cell and "arranged his body on the bed so it looked like he was sitting up, . . . relaxing on his bunk." Id. at 16. "Lewis said [Ridley] was in the same position four days later." Id. at 20. Accepting these allegations as true, the Court finds that Lewis is not entitled to qualified immunity at this stage of the litigation.

As to Defendant Eberlein, Moss alleges that on September 8, 2017, along with Defendant Lewis, Eberlein arranged Ridley's body on his bed so it appeared Ridley was sitting up and relaxing—which is how Ridley remained

for several days. SAC at 16. Moss's allegations are sufficient to state a claim of a violation of a clearly established constitutional right. Thus, at this point, Eberlein is not entitled to qualified immunity on the failure to protect claim.

Moss alleges that Defendant Greene, along with Nyitray, on September 8, 2017, placed Ridley on a toilet, removed his handcuffs, and "let him go," and "Ridley then fell to the floor face-first and lay in a pool of blood for hours." SAC at 15. Despite being informed, Greene did not take any action. Id. at 20. The following day (September 9, 2017), Greene checked on Ridley eight times, indicating "there was nothing unusual but Ridley hadn't moved." Id. at 17. On September 10, 2017, Green checked on Ridley four times. Given the allegations in the SAC that Ridley did not move for several days from this position, the Court finds that, taking Moss's allegations as true, she has stated a failure to protect claim against Greene, and Greene is not entitled to qualified immunity at this time.

Finally, as to Defendant Flynn, Moss alleges that on September 11, 2017, Flynn checked on Ridley 14 times, including serving Ridley all 3 meals while taking the trays "away untouched." SAC at 18. "Flynn would have seen that each time Ridley was propped up on his bunk in just the same position as the time before, unmoving and without food." Id. When serving Ridley his last meal

that day, "Flynn opened the food slot but did not leave any food." Id. The next

day, September 12, 2017, "Flynn conducted one security check on Ridley. He

had to see Ridley in the same position with untouched meals on the floor." Id.

at 21. Taking Moss's allegations as true, the Court finds she has stated a viable

failure to protect claim against Flynn, and Flynn is not entitled to qualified

immunity at this time.

At this juncture, the Court finds that the Nettles Defendants' request for

qualified immunity on this claim is due to be denied.

### h. Abuse or Neglect of a Vulnerable Adult – Failure to State a Claim

Defendants Eberlein, Lewis, Greene, and Flynn assert that Moss fails to

state a claim against them for abuse or neglect of a vulnerable adult (Count

VII). See Doc. 88 at 18-21. Moss argues that she has sufficiently stated a claim,

and that Defendants misinterpret the cases on which they rely. Doc. 100 at 17-

18.

In the SAC, Moss alleges that Ridley was a vulnerable adult, and

Defendants abused and neglected him. See SAC at 42-43. Pursuant to Florida

Statute § 415.1111:

> A vulnerable adult who has been abused, neglected, or
> exploited as specified in this chapter has a cause of
> action against any perpetrator and may recover actual

> and punitive damages for such abuse, neglect, or
> exploitation. The action may be brought . . . by the
> personal representative of the estate of a deceased
> victim without regard to whether the cause of death
> resulted from the abuse, neglect, or exploitation.

A "vulnerable adult," is defined as "a person 18 years of age or older whose

ability to perform the normal activities of daily living or to provide for his or

her own care or protection is impaired due to a mental, emotional, sensory,

long-term physical, or developmental disability or dysfunction, or brain

damage, or the infirmities of aging." Fla. Stat. § 415.102(28). Additionally,

> "Abuse" means any willful act or threatened act by a
> relative, caregiver, or household member which causes
> or is likely to cause significant impairment to a
> vulnerable adult's physical, mental, or emotional
> health. Abuse includes acts and omissions.
>
> . . . .
>
> "Neglect" means the failure or omission on the part of
> the caregiver or vulnerable adult to provide the care,
> supervision, and services necessary to maintain the
> physical and mental health of the vulnerable adult,
> including, but not limited to, food, clothing, medicine,
> shelter, supervision, and medical services, which a
> prudent person would consider essential for the well-
> being of a vulnerable adult. The term "neglect" also
> means the failure of a caregiver or vulnerable adult to
> make a reasonable effort to protect a vulnerable adult
> from abuse, neglect, or exploitation by others.
> "Neglect" is repeated conduct or a single incident of
> carelessness which produces or could reasonably be

> expected to result in serious physical or psychological
> injury or a substantial risk of death.

Fla. Stat. § 415.102(1), (16).

Taking as true the allegations in the SAC, the Court finds that at this point, Moss has sufficiently stated a claim. Therefore, Defendants Eberlein, Lewis, Greene, and Flynn's request to dismiss Count VII will be denied.

### i. IIED – Failure to State a Claim

According to the Nettles Defendants, Moss has failed to adequately allege an IIED claim against them. See Doc. 88 at 21-23.

> Florida courts have explained that a claim for [IIED] has four elements: (1) deliberate or reckless infliction of mental suffering; (2) outrageous conduct by the defendant; (3) the conduct caused the emotional distress; and (4) the emotional distress was severe. See, e.g., Thomas v. Hospital Bd. of Directors of Lee Cnty., 41 So. 3d 246, 256 (Fla. 2d DCA 2010); Stewart v. Walker, 5 So. 3d 746, 749 (Fla. 4th DCA 2009). To demonstrate that the defendant engaged in outrageous conduct, the plaintiff must show that the defendant's actions were "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" Metropolitan Life Ins. Co. v. McCarson, 467 So. 2d 277, 278-79 (Fla. 1985) (quoting Restatement (Second) of Torts § 46 (1965)).

Christman v. Walsh, 416 F. App'x 841, 845 (11th Cir. 2011); see Knezevich v. Carter, 805 F. App'x 717, 725-26 (11th Cir. 2020).

Considering as true Moss's allegations in the SAC, the Court finds that she has stated a viable IIED claim against these Defendants. Thus, their Motion is due to be denied to the extent it seeks dismissal of the IIED claim.

### j. NIED – Sovereign Immunity or Failure to State a Claim

The Nettles Defendants contend that they are entitled to sovereign immunity with respect to Moss's NIED claim (Count IX). See Doc. 88 at 23-24. Alternatively, Defendants argue that "[Moss] fails to plead her own emotional distress impact sufficiently." Id. at 23 n. 6. In response, Moss contends that sovereign immunity does not apply, and Moss's "NIED claim is about Mr. Ridley's emotional distress after he suffered a 'discernable physical injury.'" Doc. 100 at 20 (emphasis omitted). "[Moss] seeks damages on behalf of Mr. Ridley as his personal representative." Id. (emphasis omitted).

Florida Statute section 768.28(9)(a) provides in pertinent part:

> An officer, employee, or agent of the state or of any of its subdivisions may not be held personally liable in tort or named as a party defendant in any action for any injury or damage suffered as a result of any act, event, or omission of action in the scope of her or his employment or function, unless such officer, employee, or agent acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

Fla. Stat. § 768.28(9)(a).

Considering Moss's allegations overall, the Court finds that she has alleged the NIED was committed with malicious purpose or in a manner exhibiting wanton and willful disregard of Ridley's rights and safety. Thus, the Motion is due to be denied in this regard.

As to Defendants' impact rule argument, Moss contends that Defendants misinterpret the claim—Moss is bringing the NIED claim for Ridley's injuries; thus, "[s]he need not show her own physical impact or manifestation to recover predeath damages for [Ridley's] suffering." Doc. 100 at 20. Because Defendants argue only that "[Moss] fails to plead her own emotional distress impact sufficiently," which is not on point with Moss's allegations, Defendants' Motion is due to be denied to that extent.

Accordingly, it is

**ORDERED**:

1. Defendants Anderson, Jerrels, Livingston, Nyitray, and Potosky's Motion to Dismiss (Doc. 80), which was joined by Defendant Givens (Doc. 109), is **DENIED**.

2. Defendant Dixon's Motion to Dismiss Count VII (Doc. 87) is **DENIED**.

3. Defendants Nettles, Lewis, Eberlein, Greene, and Flynn's Motion

to Dismiss (Doc. 88) is **DENIED**.

      4.     Defendants' Joint Motion to Stay Discovery (Doc. 121) is **DENIED as moot**.

      5.     The discovery responses filed by counsel Samantha Dunlap-Smart (Doc. 122) are **STRICKEN**.

      6.     Defendants shall answer the SAC by **June 26, 2023**.

      **DONE AND ORDERED** at Jacksonville, Florida, this 26th day of May, 2023.

**MARCIA MORALES HOWARD**
United States District Judge

JAX-3 5/4
c:
Counsel of Record

40